UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

THOMAS W. ALVESTEFFER,

                    Plaintiff,                                    Hon. Phillip J. Green

v.                                                                        Case No. 1:20-cv-703

HOWMET AEROSPACE,

                    Defendant.

_____/

## OPINION

This matter is before the Court on Plaintiff's Motion for Judgment on the Administrative Record (ECF No. 32) and Defendant's Motion for Judgment Based on the Administrative Record (ECF No. 34).   The parties have consented to proceed in this Court for all further proceedings, including trial and an order of final judgment. 28 U.S.C. § 636(c).   By Order of Reference, the Honorable Janet T. Neff referred this case to the undersigned.   (ECF No. 12).   For the reasons articulated herein, Plaintiff's motion will be granted in part and denied in part and Defendant's motion will be denied.

## BACKGROUND

In his Complaint (ECF No. 1), Plaintiff alleges the following.   Plaintiff began working for Defendant Howmet Aerospace (Howmet) on March 3, 2003.   Part of Plaintiff's compensation was participation in a disability plan, which paid disability benefits for employees who became disabled as defined by the Plan (the Plan).   Plaintiff

-1-

subsequently suffered multiple strokes and underwent multiple neck surgeries.   As a result of his diminished health and ability to work, Plaintiff discontinued working for Howmet on May 19, 2017, after which he applied for disability benefits alleging that he was "totally disabled."   The Plan defines "totally disabled" as follows:

> Totally disabled means that because of injury or sickness:
>
> Within the first 24 months of the onset of your disability, you cannot perform each of the material duties of your regular job; and
>
> After the first 24 months from the onset of your disability, you cannot perform each of the material duties of any gainful occupation[1] for which you are reasonably suited by training, education or experience.

(ECF No. 27, PageID.1804).

Because Plaintiff was unable to perform his regular job, he was paid disability benefits for 24 months.   Defendant, however, terminated Plaintiff's disability benefits as of May 22, 2019, on the ground that there existed several gainful occupations he could perform despite his impairments and limitations.   (ECF No. 17, PageID.322). Plaintiff pursued his rights of appeal as articulated in the Plan, but the decision to terminate his benefits was affirmed at each step of the appellate process.

Plaintiff initiated this action on July 30, 2020, against Howmet alleging that its decision to terminate his disability benefits was "in direct violation of the terms of the Plan" and violates the Employee Retirement Income Security Act (ERISA).   Plaintiff

---

[1] Inexplicably, the Plan does not define "gainful occupation."   But Defendant appears to have implicitly defined this term as an occupation the compensation for which is "equal or greater than 70% of your adjusted pre-disability earnings."   (ECF No. 17, PageID.322).

requests that the Court find him entitled to disability benefits from May 22, 2019, onward and order Howmet to immediately pay (with interest) all unpaid benefits to which he is entitled.   Plaintiff also requests that Defendant reimburse his reasonable attorney's fees and costs.   Plaintiff now moves for judgment on his claims.   Defendant likewise has moved to affirm its decision terminating Plaintiff's disability benefits.

## LEGAL STANDARD

The parties have stipulated that Defendant's decision to terminate Plaintiff's disability benefits is evaluated pursuant to the arbitrary and capricious standard. While this is a deferential standard of review, "it is not a rubber stamp for the administrator's determination."   *Elliott v. Metropolitan Life Ins. Co.*, 473 F.3d 613, 617 (6th Cir. 2006).   Instead, the Court has an obligation to "review the quantity and quality of the medical evidence," and to determine if Defendant's decision "is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." *Glenn v. MetLife*, 461 F.3d 660, 666 (6th Cir. 2006).   Furthermore, while the Court must consider "the opinions on both sides of the issues," the Court is limited to reviewing the rationale "actually made by the plan administrator, not to provide an adequate basis where none was offered."   *Glenn*, 461 F.3d at 666, 672.

## ANALYSIS

As detailed herein, the shortcomings in Defendant's decision and decision-making process are numerous.   The Court need not struggle with the question whether any of these shortcomings, considered alone, are sufficient to warrant relief for Plaintiff,

because considered together the only reasonable conclusion is that Defendant's decision to terminate Plaintiff's disability benefits was arbitrary and capricious.

A.     Evidence Prior to January 2019

The parties, curiously, have failed to discuss in any detail Plaintiff's medical condition prior to the beginning of his period of disability in May 2017.   Nonetheless, the meager evidence cited by Plaintiff reveals the following.

In March 2014, Plaintiff underwent a cardiac catheterization procedure and stent implantation after suffering an "acute or subacute myocardial infarction caused by the occlusion of the first diagonal branch of the left anterior descending artery."   (ECF No. 22, PageID.1093-95).   In February 2016, Plaintiff underwent "C6-7 anterior cervical interbody arthroplasty with a Mobi-C device."[2]   (ECF No. 25, PageID.1442-43).   This procedure ultimately proved unsuccessful and in May 2017, Plaintiff underwent surgery to remove the Mobi-C device and perform a C6-7 fusion.   (ECF No. 25, PageID.1442-45). On October 20, 2018, Plaintiff reported to the emergency room after experiencing slurred

---

[2] Surgical implantation of a Mobi-C Cervical Disc is an alternative to cervical fusion. *See Cervical Fusion vs. Disc Replacement*, Orthopedic Institute of Pennsylvania, available at https://www.oip.com/cervical-fusion-vs-disc-replacement/ (last visited on Feb. 17, 2022).   Cervical fusion surgery "joins the vertebrae in the neck region of the spine."   Alternatively, cervical disc replacement involves "remov[ing] the damaged intervertebral disc and replac[ing] it with an artificial one.   Unlike cervical fusion, disc replacement does not involve welding bones together."   *Id.*

speech.  (ECF No. 19, PageID.611-12).   Plaintiff was hospitalized and diagnosed with having suffered "a CVA/TIA with dysarthria."[3]   (*Id.*).

B.     January 2019 Examinations and Evaluations

On January 7, 2019, Plaintiff participated in an independent medical evaluation conducted by Dr. Emmanuel Obianwu.  (ECF No. 19, PageID.572-81).   Plaintiff reported that his neck and upper extremity symptoms "have gotten significantly better" following his May 2017 surgery.  (*Id.,* PageID.574).   Plaintiff also reported, however, that he was "unable to lift any weighty material" due to shoulder pain.  (*Id.*).   Plaintiff also reported that if he "turns his neck suddenly from side to side," he experiences "pain in the base of the neck" which radiates into his upper extremities.   (*Id.*).

Plaintiff exhibited limited range of cervical motion and generally good strength in his upper extremities.  (*Id.*, PageID.576-77).   The doctor did not discern, however, evidence of sensory abnormality in Plaintiff's upper extremities.  (*Id.*, PageID.577).

---

[3] CVA refers to a cerebrovascular accident, a circumstance caused by "a loss of blood flow to part of the brain, which damages brain tissue."  *See* Cerebrovascular Accident, National Cancer Institute, available at https://www.cancer.gov/publications/dictionaries/cancer-terms/def/cerebrovascular-accident (last visited on February 17, 2022).   A CVA is also referred to as a stroke.  *Id.* TIA refers to a transient ischemic attack, also known as a "ministroke," in which the person suffers "a temporary period of symptoms similar to those of a stroke."  *See* Transient Ischemic Attack (TIA), Mayo Clinic, available at https://www.mayoclinic.org/diseases-conditions/transient-ischemic-attack/symptoms-causes/syc-20355679 (last visited on Feb. 17, 2022).   Dysarthria "occurs when the muscles you use for speech are weak or you have difficulty controlling them" which "often causes slurred or slow speech that can be difficult to understand."  *See* Dysarthria, Mayo Clinic, available at https://www.mayoclinic.org/diseases-conditions/dysarthria/symptoms-causes/syc-20371994 (last visited on Feb. 17, 2022).

Dr, Obianwu concluded that Plaintiff was suffering "a progressive disease state" of the cervical spine which limited his ability to function.  (*Id.*, PageID.578).   The doctor completed a Capabilities and Limitations Worksheet regarding Plaintiff's ability to function.  (*Id.*, PageID.581).   Specifically, Dr. Obianwu reported the following: (1) Plaintiff can lift twenty pounds occasionally and ten pounds frequently; (2) he can occasionally climb, lift, push, pull, carry, bend, twist, stand, stoop, walk, perform repetitive motion, and reach forward and above his shoulders; (3) he can frequently, crawl, kneel, and perform grasping/manipulation activities with his upper extremities; (4) he can constantly sit; and (5) he cannot perform frequent flexing or rotation movements of his head/neck.  (*Id.*).

On January 28, 2019, Virginia Easterwood performed a Transferable Skills Analysis to identify the jobs Plaintiff could still perform despite his impairments and limitations.  (ECF No. 17, PageID.393-98).   Using the functional limitations articulated by Dr. Obianwu, Easterwood identified three occupations that "meet all required criteria, including reasonable wage,[4] education, experience, training and functional capacity."  (*Id.*, PageID.397).   Specifically, Easterwood concluded that Plaintiff could still perform the following occupations: (1) production engineer;[5]

---

[4] The "target wage" in Easterwood's analysis was $25.58 per hour.  (ECF No. 17, PageID.393).

[5] As Easterwood noted, production engineer was Plaintiff's "same occupation."  (ECF No. 17, PageID.396).   This conclusion appears to be at odds with the decision to initially award Plaintiff disability benefits because he could no longer perform his "regular job." Resolution of this conundrum lies in recognizing the distinction between this job as

(2) driver supervisor, and (3) dispatcher, bus and trolley.   (*Id.*).   It is important to note that all three occupations identified by Easterwood required Plaintiff to be able to perform "light" work.   (*Id.*, PageID.396-97).

C.     Medical Evidence from March 5, 2019, through April 23, 2019

On March 5, 2019, Plaintiff participated in an MRI examination of his right shoulder, the results of which revealed "significant" degenerative changes.   (ECF No. 21, PageID.921, 985; ECF No. 24, PageID.1349).   An MRI of Plaintiff's cervical spine, performed the same day, revealed a bulging disc at C5-6 "with cord compression and congenital spinal narrowing."   (ECF No. 21, PageID.917-18, 985).

On April 10, 2019, Plaintiff was examined by neurosurgeon Dr. Rick Edgar. (ECF No. 21, PageID.981-86).   Plaintiff reported experiencing pain in his neck and middle back as well as "numbness and tingling down the right side of his body and arm." (*Id.*, PageID.985-86).   Dr. Edgar recommended to Plaintiff that he undergo cervical fusion surgery.   (*Id.*, PageID.986).   Plaintiff agreed.   (*Id.*).

On April 17, 2019, Plaintiff was examined by Dr. Jeffrey Recknagel.   (ECF No. 24, PageID.1348-50).   Plaintiff reported that he was experiencing worsening shoulder pain for which conservative treatment provided no relief.   (*Id.*, PageID.1348-

---

Plaintiff actually performed it and how such is classified by the Dictionary of Occupational Titles (DOT).   As actually performed, Plaintiff's position with Defendant was characterized as a medium level job.   (ECF No. 24, PageID.1364).   But, according to the DOT on which Easterwood relied, the job of production engineer is considered a light duty job.   *See* Production Engineer, Dictionary of Occupational Titles, available at https://occupationalinfo.org/01/012167046.html (last visited Feb. 18, 2022).

49).   An examination revealed positive impingement bilaterally.   (*Id.*, PageID.1349).

O'Brien's testing[6] was negative on the left, but positive on the right.   (*Id.*).   The doctor

diagnosed Plaintiff as suffering degenerative arthritis and impingement syndrome

bilaterally as well as "biceps tendinopathy and a likely SLAP lesion"[7] on the right.   (*Id.*).

The doctor recommended that Plaintiff undergo surgery to repair his right shoulder.

(*Id.*, PageID.1350).   Plaintiff agreed.   (*Id.*).

On April 23, 2019, Plaintiff participated in an EKG test in preparation for his

upcoming surgery.   (ECF No. 19, PageID.690-98).   During this test, Plaintiff

experienced an ST-elevated myocardial infarction (also known as a STEMI).[8]   (*Id.*).

Plaintiff was hospitalized and underwent a cardiac catheterization procedure and

implantation of a second coronary stent.   (ECF No. 19, PageID.690-98).

---

[6] O'Brien's test assesses the presence of labral injuries or tears.   *See* O'Brien's Test –
Orthopedic       Examination       of       the       Shoulder,       available       at
https://physicaltherapyweb.com/obriens-test/ (last visited on Feb. 17, 2022).

[7] A SLAP lesion refers to a Superior Labrum, Anterior to Posterior tear within the
shoulder.       *See*       SLAP       Tear,       Cleveland       Clinic,       available       at
https://my.clevelandclinic.org/health/diseases/21717-slap-tear (last visited on Feb. 17,
2022).

[8] A STEMI is "[t]he most deadly type of heart attack" as it results from "a total or nearly
total blockage of a coronary artery that supplies oxygen-rich blood to part of the heart
muscle."   *See* STEMI Heart Attack, University of Kansas Health System, available at
https://www.kansashealthsystem.com/care/conditions/stemi-heart-attack (last visited on
Feb. 17, 2022).

D.     Aetna's April 24, 2019, Termination of Benefits

On April 24, 2019, Aetna, who administered Defendant's Long-Term Disability Plan, issued a determination to terminate Plaintiff's disability benefits as of May 22, 2019.   (ECF No. 17, PageID.322-23).   Based upon the results of Virginia Easterwood's Transferable Skills Analysis, which was conducted on January 28, 2019, Aetna determined that Plaintiff was "capable of performing in the light physical demand level occupations on a full time basis."   (*Id.*, PageID.322).   Significantly, however, in making this assessment, Aetna failed to consider the medical evidence from March and April 2019 discussed immediately above.

E.     Plaintiff's Initial Appeal

Plaintiff subsequently appealed Aetna's April 24, 2019, decision to terminate his disability benefits.   (ECF No. 25, PageID.1447-91).   In support of his appeal, Plaintiff submitted hundreds of pages of medical records, including the evidence from March and April 2019 noted above.   (ECF No. 18, PageID.547-ECF No. 25, PageID.1446).   In response to Plaintiff's appeal, Aetna retained three doctors to perform a review of the medical record and opine on Plaintiff's ability to perform work.   It must be noted, however, that none of these doctors examined Plaintiff.   This factor weighs in Plaintiff's favor.   *See, e.g., James v. Liberty Life Assurance Co. of Boston*, 582 Fed. Appx. 581, 586 (6th Cir., Sept. 4, 2014) (whether a doctor has physically examined the claimant is a factor the Court may consider when evaluating a decision to deny benefits).

1.     Dr. Behzad Emad

The first of these reviews was conducted by Dr. Behzad Emad.  (ECF No. 18, PageID.476-92).   While many of Dr. Emad's findings were generally consistent with Dr. Obianwu's findings, the two doctors' findings differed in important respects.   For example, while Dr. Obianwu determined that Plaintiff could lift up to twenty pounds, Dr. Emad concluded that Plaintiff could lift no more than ten pounds.   (*Id.*, PageID.487-90, 581).   Dr. Obianwu concluded that Plaintiff was able to occasionally reach above shoulder level with both upper extremities, Dr. Emad, however, found that Plaintiff was unable to reach above shoulder level with his right upper extremity.   (*Id.*, PageID.487-90, 581).   Also, while Dr. Obianwu reported that Plaintiff could sit continuously for five to eight hours, Dr. Emad found that Plaintiff was unable to sit continuously for more than one hour.   (*Id.*, PageID.487-90, 581).

Thus, by expressly finding that Plaintiff was limited to sedentary work, Dr. Emad's findings were contrary to Dr. Obianwu's conclusion that Plaintiff could perform light work.   Likewise, Dr. Emad's findings were contrary to Virginia Easterwood's conclusion, based upon Dr. Obianwu's findings, that there existed light duty jobs which Plaintiff could still perform despite his impairments and limitations.

To avoid the logically obvious conclusion that the decision to terminate Plaintiff's disability benefits was not supported, Dr. Emad offered the following conclusion:

> Yes, the claimant is able to perform full time duty, 8 hours per day, 40 hours per week with the outlined restrictions and limitations.

(*Id.*, PageID.490).

The extent to which Defendant could reasonably rely on this statement must be clarified.  Inasmuch as Dr. Emad expressed the opinion that Plaintiff could function on a fulltime basis within the restrictions and limitations he identified, this is properly characterized as a "medical" opinion within the doctor's realm of expertise.  But, to the extent this statement is interpreted as a *vocational* conclusion that there actually exist jobs that Plaintiff can perform consistent with the restrictions and limitations identified, such constitutes an opinion well outside Dr. Emad's area of expertise.  Stated differently, while Dr. Emad is competent to opine on the extent to which Plaintiff can function, he is not competent to opine whether any jobs consistent with Plaintiff's residual functional ability actually exist.

2.   Dr. Leon Meytin

Likewise, Dr. Leon Meytin was retained by Aetna to review the record and render an opinion on Plaintiff's disability claim.  (ECF No. 18, PageID.493-99).  The shortcomings with Dr. Meytin's assessment, and Defendant's reliance thereon, are obvious and significant.  First, unlike Dr. Emad, who reviewed hundreds of pages of medical records, Dr. Meytin reviewed only three items, all of which were from 2017.  (*Id.*, PageID.494).  Defendant argues that the various doctors who reviewed the record on its behalf assessed different portions thereof because their medical specialties differed and they were asked to opine only on matters within their given specialty.  While this approach may be permissible, it is likewise permissible for the Court to weigh in

Plaintiff's favor the fact that Defendant engaged in such an atomistic and piecemeal review of the record.   *See, e.g., Liberty Life Assur.*, 582 Fed. Appx. at 586-89.

Next, with respect to Plaintiff's neck and back pain, Dr. Meytin stated, "from a neurological standpoint I do not see any restrictions."   (*Id.*, PageID.498).   This despite the fact that Plaintiff was experiencing a "progressive disease state" for which multiple surgeries had already been performed with yet another scheduled for the future.   The Court can only speculate whether the doctor would have reached a different conclusion had he been provided with a complete picture of Plaintiff's medical history.   Finally, Dr. Meytin, without ever examining Plaintiff, discounted the credibility of Plaintiff's subjective allegations of pain and limitation.   (*Id.*, PageID.498).   This likewise weighs in Plaintiff's favor.   *See, e.g., Evans v. UnumProvident Corp.*, 434 F.3d 866, 878 (6th Cir. 2006) (while "there is nothing inherently improper with relying on a file review," where such includes "credibility determinations regarding a claimant's medical history and symptomatology, reliance on such review may be inadequate").

3.    Dr. Maitrayee Vadali

Finally, Aetna employed Dr. Maitrayee Vadali to review the record and opine on Plaintiff's disability.   (ECF No. 17, PageID.435-44).   While Dr. Vadali reviewed a significant portion of the medical record, her review was limited to her expertise in cardiology.   Again, the Court weighs in Plaintiff's favor the decision by Defendant to conduct such an atomistic and piecemeal review of the record.   *See, e.g., James*, 582 Fed. Appx. at 586-89.   Despite Plaintiff's history of adverse cardiac events detailed above,

Dr. Vadali discounted Plaintiff's subjective allegations of shortness of breath and chest pain without ever examining Plaintiff.  This likewise weighs in Plaintiff's favor.  *See, e.g., Evans*, 434 F.3d at 878.  Finally, the doctor opined that aside from a ten-pound lifting restriction, Plaintiff experiences no other work-related limitations.  The unreasonableness of this statement is evident from the discussion above.

4.     Aetna's Failure to Share these Evaluations with Plaintiff

ERISA expressly provides that every employee benefit plan shall "afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim."  29 U.S.C. § 1133.  Federal regulations further elaborate on this affirmative obligation thusly:

> before the plan can issue an adverse benefit determination on review on a disability benefit claim, the plan administrator shall provide the claimant, free of charge, with any new or additional evidence considered, relied upon, or generated by the plan. . .such evidence must be provided as soon as possible and sufficiently in advance of the date on which the notice of adverse benefit determination on review is required to be provided. . .to give the claimant a reasonable opportunity to respond prior to that date.

29 C.F.R. § 2560.503-1(h)(4)(i).

An evaluation by a physician retained by the plan administrator "falls squarely within this disclosure requirement."  *Schwarz v. Hartford Life and Accident Ins. Co.*, 443 F.Supp.3d 1085, 1089-90 (N.D. Cal. 2020).  Furthermore, failure to comply with this requirement deprives the claimant of "a reasonable opportunity for a full and fair review."  *Id.* at 1090.

Defendant concedes that it violated this requirement by failing to provide Plaintiff with the reports produced by Drs. Emad, Meytin, and Vadali.   (ECF No. 37, PageID.1946-47).   Defendant nevertheless argues that the Court should overlook this failure because it "substantially complied with ERISA's procedural requirements" by seeking "feedback" from Plaintiff's care providers.   It must be noted, however, that Drs. Emad, Meytin, and Vadali never actually spoke to any of Plaintiff's care providers. Rather, as detailed in each of their reports, these doctors attempted, in total thirteen times, to speak with Plaintiff's care providers.   (ECF No. 17, PageID.442, 485-86, 496-97).   Their attempts were, however, all unsuccessful.   (*Id.*).

Defendant's argument is totally without merit and is, therefore, easily rejected. First, this failure does not reflect a one-time oversight, but instead represents a determined and calculated effort to deny Plaintiff his due process right to respond to deficient evidence.   Furthermore, Defendant has identified no authority suggesting that the mere attempt to communicate with Plaintiff's care providers constitutes "substantial compliance" with its affirmative obligation to provide Plaintiff with the information on which its benefits denial decision rested.

5.    Aetna's Denial of Plaintiff's Appeal

On January 31, 2020, Aetna issued its decision denying Plaintiff's appeal.   (ECF No. 17, PageID.384-85).   The rationale for this determination is faulty and insufficient.

-14-

In support of its determination, Aetna states that Plaintiff is subject to the following functional limitations: (1) during an eight-hour day, Plaintiff can sit for one hour continuously and six hours total; (2) during an eight-hour day, he can stand/walk continuously for one hour and two hours total; (3) he can occasionally handle, finger, grasp, pinch, grip, and use hand controls; (4) he cannot reach overhead or above shoulder level with his right upper extremity and can only occasionally do so with his left upper extremity; (5) he can occasionally reach below waist level and at desk level; (6) he can lift, carry, push, and pull ten pounds occasionally and five pounds frequently; (7) he can occasionally kneel, squat, crawl, crouch, bend, and twist; and (8) he cannot climb ladders or perform tasks at unprotected heights.  (*Id.*).  In short, Aetna determined that Plaintiff was limited to performing a very limited range of sedentary work.  From this, Aetna further determined that Plaintiff retained the ability to perform "any reasonable occupation."  (*Id.*).  This "analysis" and conclusion does not survive scrutiny.

First, Aetna misstates the relevant standard as articulated in the Plan.  Aetna denied Plaintiff's appeal on the ground that he retained the ability to perform "any reasonable occupation."  As noted above, to deny Plaintiff's claim for disability benefits after the first 24 months, Defendant must find that Plaintiff "cannot perform each of the material duties of any gainful occupation for which [he is] reasonably suited by training, education or experience."  Aetna's decision, however, fails to identify any occupation, or material duties of an occupation, which Plaintiff can allegedly perform despite his limitations.  This fails to satisfy the criteria articulated in the Plan.

Second, to the extent Aetna's decision rests upon the Transferable Skills Analysis performed by Virginia Easterwood, it likewise fails.   As noted above, Easterwood's analysis was premised upon Dr. Obianwu's conclusion that Plaintiff retained the ability to perform *light* work.   In her report, Easterwood identified three jobs that Plaintiff could allegedly still perform, but she clearly indicated that all three jobs required the ability to perform *light* work.   In its decision denying Plaintiff's appeal, Aetna concluded that Plaintiff was limited to *sedentary* work.   Thus, Aetna implicitly concluded that Plaintiff was *unable* to perform the jobs identified by Easterwood and failed to identify any other occupations Plaintiff could still perform.   Simply put, the decision denying Plaintiff's appeal disregarded Plaintiff's right to a fair hearing and was devoid of evidentiary support.

E.    Plaintiff's Second Appeal

In response to Plaintiff's appeal of this determination, a records review was performed by Dr. Paul Kaloostian.   (ECF No. 17, PageID.388-92).   Again, it must be noted that Dr. Kaloostian did not examine Plaintiff.   Also, it is not clear from the doctor's report what records or evidence he was provided.   The doctor simply stated that he reviewed the "case notes" and an "undated compact disc."   (*Id.* at PageID.388).

Dr. Kaloostian did not articulate any functional limitations from which Plaintiff suffers, but instead merely concluded that Plaintiff "would be considered reasonable (sic) able to perform the material duties of any gainful employment to which he is suited, given the clinical history and there is no indication that [Plaintiff] is totally or

permanently disabled or unable to perform any full-time occupation." (*Id.*, PageID.390).[9]  This statement is the epitome of circular logic.   The doctor did nothing more than conclude that Plaintiff could perform any work which he was able to perform.  But, by failing to perform any assessment of Plaintiff's functional abilities and limitations, the doctor's statement is utterly meaningless.   Moreover, to the extent Defendant argues that Dr. Kaloostian concluded that Plaintiff suffers from no functional or vocational limitations, such is rejected as completely without basis or support.  Plaintiff's second appeal was denied.   (ECF No. 27, PageID.1740-41).   The one-page decision supporting such, however, merely parrots the circular and unsupported conclusions offered by Dr. Kaloostian.   (*Id.*).   Having exhausted his appeal rights under the Plan, Plaintiff subsequently initiated the present action.

F.    Conclusion

Based on the discussion herein, the many shortcomings in Defendant's decision to terminate Plaintiff's disability benefits are obvious.   First, the April 2019 decision to terminate Plaintiff's disability benefits was based upon the January 2019 assessments by Dr. Obianwu and Virginia Easterwood that Plaintiff could still perform light duty work.   These assessments, however, were significantly undermined by subsequent events.   Defendant nevertheless ignored this relevant medical evidence and terminated

[9] The Court notes that Dr. Kaloostian's report was not provided to Plaintiff.   For the reasons already noted, this fact weighs in Plaintiff's favor.

-17-

Plaintiff's disability benefits.   That Defendant subsequently concluded that Plaintiff was limited to sedentary work only underscores the error in its April 2019 determination.

Defendant attempts to avoid this obvious conclusion by arguing that Dr. Obianwu and Virginia Easterwood cannot be faulted for failing to consider events that had not yet occurred at the time of their assessments.   This is a red herring.   The deficiency is not that Dr. Obianwu and Virginia Easterwood failed to "predict the future," but rather that despite subsequent events that undermined their assessments, Defendant nonetheless relied on them to terminate Plaintiff's benefits.

The decision to deny Plaintiff's initial appeal suffers from numerous deficiencies. This decision was based upon the results of a piecemeal assessment by three doctors none of whom examined Plaintiff.    Moreover, these records reviewers made unsupported credibility determinations without ever examining Plaintiff and likewise offered opinions on vocational matters well beyond their areas of expertise.   Defendant then violated Plaintiff's right to a full and fair hearing by failing to provide Plaintiff with the results of these assessments.   Furthermore, in its decision denying Plaintiff's appeal, Defendant concluded that Plaintiff was limited to sedentary work, but then failed to identify any sedentary job or occupation which Plaintiff could still perform.

Finally, the decision denying Plaintiff's final appeal is even less supportable.   Dr. Kaloostian neither examined Plaintiff nor identified the materials he considered.   The doctor did not indicate that Plaintiff experienced any vocational limitations, but instead simply offered the circular and unsupported conclusion that Plaintiff could perform any

work which he was able to perform.   The doctor also failed to provide Plaintiff with a copy of his findings in violation of Plaintiff's right to a full and fair hearing.   Defendant's decision denying Plaintiff's final appeal contains no analysis, but instead merely parrots Dr. Kaloostian's unsupported conclusions.

Having reviewed the "quantity and quality of the medical evidence," the Court finds that Defendant's decision to terminate Plaintiff's disability benefits is, for the reasons articulated herein, devoid of "deliberate, principled reasoning" and is not "supported by substantial evidence."   In sum, Defendant's decision was arbitrary and capricious.   Accordingly, Plaintiff is entitled to relief.

G.   Remedy

Having concluded that Defendant's decision to terminate Plaintiff's disability benefits was improper, the question becomes the remedy to which Plaintiff is entitled. The Sixth Circuit has indicated that in circumstances such as this, the Court has two options: (1) award benefits to the claimant or (2) remand the matter to the plan administrator.   *See, e.g., Shaw v. AT & T Umbrella Benefit Plan No. 1*, 795 F.3d 538, 551 (6th Cir. 2015).

In his complaint, Plaintiff requests that the Court order Defendant to resume his disability payments, including payment (with interest) of back benefits improperly withheld.   Plaintiff has failed, at this juncture, to demonstrate entitlement to this relief.   While Plaintiff has persuasively established that Defendant's decision terminating his benefits was arbitrary and capricious, whether Plaintiff is disabled as

defined by the Plan is a matter beyond the experience and expertise of this Court. Plaintiff has failed to persuade the Court that he is disabled as defined by the Plan. Defendant's conclusion that Plaintiff can still perform a limited range of sedentary work does not appear unreasonable.  Furthermore, while Defendant has failed to present evidence that there exist sedentary jobs which Plaintiff can still perform, Plaintiff has failed to present evidence that no such jobs exist.

As the Sixth Circuit stated, "where the problem is with the integrity of the plan's decision-making process, rather than that a claimant was denied benefits to which [he] was clearly entitled, the appropriate remedy generally is remand to the plan administrator." *Id.* at 551.  Accordingly, the Court will remand this matter to Defendant for further assessment whether Plaintiff is disabled as defined by the Plan.

VII.   Attorney's Fees and Costs

Plaintiff also requests that the Court order Defendant to reimburse the reasonable attorney's fees and costs he incurred in bringing the present action. Plaintiff may very well be entitled to such relief.  *See* 29 U.S.C. § 1132(g).  But this issue has not been properly briefed by the parties.  Accordingly, Plaintiff's request for attorney's fees and costs will be denied without prejudice.

## **<u>CONCLUSION</u>**

For the reasons articulated herein, Plaintiff's Motion for Judgment on the Administrative Record (ECF No. 32) is granted in part and denied in part, and Defendant's Motion for Judgment Based on the Administrative Record (ECF No. 34) is denied.   Specifically, the Court finds that Defendant's decision terminating Plaintiff's disability benefits was arbitrary and capricious.   The Court further finds, however, that Plaintiff has failed to establish that he is entitled to the disability benefits in question. Accordingly, this matter must be remanded to Defendant for further action consistent with this Opinion.   Finally, Plaintiff's motion for attorney's fees and costs is denied without prejudice.   An Order consistent with this Opinion will be separately entered.


Date: February 22, 2022                   /s/ Phillip J. Green
                                          PHILLIP J. GREEN
                                          United States Magistrate Judge